IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

DAVID W. LOWERY,                    )
             Plaintiff,            )
                       )           Civil Action No. 4:13-cv-00060
v.                                  )
                       )           By:    Joel C. Hoppe
CAROLYN W. COLVIN,                  )           United States Magistrate Judge
Acting Commissioner,                )
Social Security Administration,     )
             Defendant.          )

## REPORT AND RECOMMENDATION

Plaintiff David Lowery asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f.[1] This Court has authority to decide Lowery's case under 42 U.S.C. §§ 405(g) and 1383(c)(3), and his case is before me by referral under 28 U.S.C. § 636(b)(1)(B). On appeal, Lowery argues that the Administrative Law Judge erred in weighing the medical opinions in his record and did not consider the combined effects of his impairments. Having considered the administrative record, the parties' briefs, and the applicable law, I find that substantial evidence supports the Commissioner's final decision that Lowery was not disabled.

### I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.*

---

[1] Lowery's attorney withdrew his application for disability insurance benefits ("DIB") at an administrative hearing on November 20, 2012, and the Administrative Law Judge dismissed the application without objection in a written decision dated December 21, 2012. *See* Administrative Record ("R.") 1, 14, 28, 37; *see also* Pl. Br. 1, ECF No. 13. On appeal, Lowery challenges only the Commissioner's final decision that he was not disabled after July 29, 2011, the relevant period for determining his eligibility for SSI. *See* Pl. Br. 1.

1

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an

impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Lowery protectively filed this SSI application on July 29, 2011.[2] Administrative Record ("R.") 103. At the time, he was 50 years old and had worked most recently as a part-time library clerk. R. 103, 288. Lowery said that he stopped working in October 2002 because of hepatitis C virus, human immunodeficiency virus ("HIV"), chronic obstructive pulmonary disease ("COPD"), sleep apnea, depression, bi-polar disorder, hypertension, and peripheral artery disease. *See* R. 287. The state agency denied Lowery's application initially in September 2011, R. 102, and upon reconsideration in April 2012, R. 132.

Lowery appeared with counsel at a hearing before Administrative Law Judge Brian Kilbane ("the ALJ" or "ALJ Kilbane") on November 20, 2012. R. 36. He testified as to his alleged impairments, and to the limitations those impairments caused in his daily activities. *See*

---

[2] This is Lowery's third SSI application. The District Judge assigned to Lowery's current case has twice affirmed final decisions denying DIB and SSI applications alleging disability based on many of the same impairments at issue here. *See Lowery v. Barnhart*, No. 4:06cv40, 2007 WL 528738 (W.D. Va. Feb. 15, 2007) (Crigler, M.J.), *adopted sub nom. Lowery v. McMahon*, ECF No. 18 (Mar. 26, 2007) (Kiser, J.) (affirming the Commissioner's final decision denying Lowery's DIB and SSI applications filed in March 2004); *Lowery v. Comm'r of Soc. Sec.*, 4:10cv47, 2011 WL 2648470 (W.D. Va. June 29, 2011) (Crigler, M.J.), *adopted by* 2011 WL 2836251 (July 14, 2011) (Kiser, J.) (affirming the Commissioner's final decision denying Lowery's DIB and SSI applications filed in February 2007).

3

R. 40–48. A vocational expert ("VE") also testified as to Lowery's past work and ability to perform other work existing in the national and regional economies. *See* R. 49–56.

In a written decision dated December 21, 2012, ALJ Kilbane concluded that Lowery was not entitled to disability benefits. *See* R. 15–28. He found that Lowery suffered from severe HIV, hepatitis, coronary artery disease, chronic liver disease, arthritis, cervical spondylosis, and sleep apnea. R. 17. Lowery's COPD, angina,[3] hyperlipidemia, and skin cancer were all "non-severe" because, among other reasons, "they have been responsive to treatment and have not resulted in any continuous exertional or non-exertional functional limitations." *Id.* The ALJ also found that Lowery's "adjustment disorder with anxiety and depressed mood" was a non-severe impairment. R. 17–18. None of Lowery's severe impairments, alone or combined, met or medically equaled an impairment listed in the Act's regulations. *See* R. 18–20.

The ALJ next determined that Lowery had the residual functional capacity ("RFC")[4] to "perform a limited range of light work."[5] R. 20. He noted that this RFC ruled out Lowery's return to his past work as a computer lab manager, network administrator, and computer consultant because the VE testified that these were all "medium" exertion jobs. R. 26, 49–50.

---

[3] Angina is a type of chest pain caused by reduced blood flow to the heart muscle. It is a symptom of coronary artery disease and is typically described as squeezing, pressure, heaviness, tightness, or pain in the chest. *See* Mayo Clinic, *Angina Definition*, http://www.mayoclinic.org/diseases-conditions/angina/basics/definition/con-20031194 (last visited Nov. 29, 2014).

[4] "RFC" is an applicant's ability to work "on a regular and continuing basis" despite his impairments. SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). The RFC takes into account "all of the relevant medical and other evidence" in the applicant's record, 20 C.F.R. § 416.945(a), and reflects the "total limiting effects" of his impairments, *id.* § 416.945(e).

[5] "Light work" involves lifting no more than twenty pounds at a time but frequently lifting or carrying objects weighing ten pounds. 20 C.F.R. § 416.967(b). A person who can lift twenty pounds (and frequently lift or carry ten pounds) can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

4

Finally, relying on the VE's testimony, the ALJ concluded that Lowery was not disabled after July 29, 2011, because he still could perform specific occupations that existed in significant numbers nationally and in Virginia, such as record clerk, rental clerk, and hand packer. R. 27. In reaching this conclusion, the ALJ also found that Lowery was not limited to a "low stress" work environment and could maintain acceptable workplace attendance and performance. R. 25–27.

Lowery submitted additional medical records with his request for the Appeals Council to review the ALJ's decision. *See* R. 5–6, 8–9, 961. The Appeals Council considered this evidence, but concluded that the "information [did] not provide a basis for changing" the ALJ's decision.[6] R. 2. The Appeals Council declined to review the ALJ's decision, R. 1, and this appeal followed.

### III. Discussion

Lowery objects to the ALJ's determination that he can perform light work and can maintain acceptable workplace attendance and performance despite his impairments. *See generally* Pl. Br. 17–19, 19–23. He argues that the ALJ should have "give[n] greater weight" to the opinions of Dr. Said Iskandar, M.D., his treating cardiologist, and Dr. E. Wayne Sloop, Ph.D., an examining psychologist. *See id.* at 17–19. Lowery also argues that the ALJ's RFC determination does not reflect the total limiting effects of his combined impairments, particularly the debilitating side effects caused by his medications. *See id.* at 20–22.

Lowery asks the Court to reverse the Commissioner's final decision and to award benefits because, according to Lowery, Drs. Iskandar and Sloop's opinions each "support a finding of disability." *Id.* at 19, 19 nn. 4–5. Alternatively, he asks the Court to remand his case

---

[6] The Appeals Council also incorporated this evidence into the administrative record submitted to this Court. *See* R. 5, 942–43, 944–59, 962–73, 974–86. Accordingly, the Court must review the entire record, including the additional evidence, in determining whether the Commissioner's final decision is supported by substantial evidence. *See Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (en banc).

5

for a rehearing so the VE can consider a hypothetical question that "properly" includes unidentified mental limitations. *Id.* at 19, 22.

A.     *Medical Opinions*

ALJs must weigh each medical opinion in the applicant's record. 20 C.F.R. § 416.927(c). Medical opinions are statements from physicians that reflect judgments about the nature and severity of the applicant's impairment(s), including his symptoms, diagnosis and prognosis, what he can still do despite his impairment(s), and his physical or mental restrictions. 20 C.F.R. § 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency reviewers. *See* 20 C.F.R. § 416.927(c). A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 416.927(c)(2).

"If not entitled to controlling weight, the value of the [treating-source] opinion must be weighed and the ALJ must consider" the factors listed in 20 C.F.R. § 416.927(c), such as the source's medical specialty, the source's familiarity with the applicant, the weight of the evidence supporting the opinion, and the opinion's consistency with other relevant evidence in the record. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam). These factors may "provide specific and legitimate grounds to reject a treating physician's opinion" if the record contains "persuasive contrary evidence." *Mastro*, 270 F.3d at 178. The ALJ must consider the same factors when weighing medical opinions from non-treating sources, although such opinions are not entitled to any particular weight. *See* 20 C.F.R. §§ 416.927(c)(1)–(6), 416.927(e)(2).

The ALJ must explain the weight given to all medical opinions and must "give good reasons" for the weight assigned to any treating-source medical opinion. 20 C.F.R. §§ 416.927(c)(2), 416.927(e)(2). Finally, if the ALJ's RFC assessment conflicts with a medical opinion, he must explain why that opinion was not adopted in full. *Davis v. Colvin*, No. 4:13cv35, slip op. at 6 (W.D. Va. July 14, 2014) (Hoppe, M.J.), *adopted by* 2014 WL 3890495 (Aug. 7, 2014) (Kiser, J.). His decision must be sufficiently specific to make clear to subsequent reviewers the weight he gave to the opinion(s) and the reasons for that weight. *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013). The ALJ's choice between conflicting medical opinions also must be supported by substantial evidence in the record. *See id.*

1.    *The Doctors' Opinions*

Lowery's treating cardiologist, Dr. Said Iskandar, M.D., completed a Cardiac Residual Functional Capacity Questionnaire on April 7, 2009.[7] R. 938–41. Dr. Iskandar diagnosed Lowery with coronary artery disease and noted that his prognosis was "good" at that time. R. 938. He opined that Lowery suffered from NYHA Class I–II heart failure[8] with chest pain,

---

[7] Lowery originally submitted this questionnaire to supplement his second DIB/SSI application, which he filed days after this Court affirmed the Commissioner's final decision denying his first application. *See* R. 53, 96–97; *Lowery*, 4:10cv47, slip op. at 2, 6–7 (W.D. Va. June 29, 2011) (Crigler, M.J.), *adopted by* 2011 WL 2836251 (Kiser, J.) (July 14, 2011). In *Lowery*, Magistrate Judge Crigler found that substantial evidence supported Administrative Law Judge R. Neely Owen's ("ALJ Owen") decision to afford "less than controlling weight" to the opinions Dr. Iskandar provided in this questionnaire because they were internally inconsistent and inconsistent with other evidence in Lowery's record as of August 2009. *See* R. 96–98. Judge Kiser adopted Magistrate Judge Crigler's recommendation without objection. *See* R. 91.

[8] According to the New York Heart Association ("NYHA") functional classification scheme, class I–II heart failure indicates at most slight limitations on physical activity, symptoms with ordinary physical activity, and no symptoms at rest. *See Lowery*, 2011 WL 2648470, at *4, *4 n.3 (citing Am. Heart Ass'n, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-ofHeartFailure-UCM-306328-Article-jsp); *accord* R. 942 (Dr. Iskandar's December 12, 2012, letter to Lowery's attorney stating that NYHA Class I–II heart failure "signifies that [Lowery] has no limitation in ordinary physical activity or only mild symptoms and only slight limitation during ordinary activity").

shortness of breath, and fatigue. *Id*. Although Dr. Iskandar did not list "anginal equivalent pain" among Lowery's cardiac symptoms, he noted that Lowery experienced anginal pain "few/month/weeks" and that nitroglycerine helped relieve the pain. *Id*. Dr. Iskandar also opined that Lowery had "marked limitations of physical activity, as demonstrated by fatigue, palpitations, dyspnea, or anginal discomfort on ordinary physical activity, even though [he] is comfortable at rest." *Id.* To that end, Dr. Iskandar noted that Lowery could occasionally lift fewer than ten pounds, rarely lift between ten and twenty pounds, and never lift fifty pounds. R. 940. Lowery could occasionally bend, crouch, squat, and climb ladders and stairs, but never twist.[9] *Id.*

Dr. Iskandar also opined that Lowery could perform "low stress jobs," but he did not explain the "role of stress in bringing on [Lowery's] symptoms." *Id.* He opined that Lowery's "physical symptoms and limitations cause" depression or chronic anxiety "when it hurts," and that those emotional factors in turn "contribute to the severity of [Lowery's] subjective symptoms and functional limitations." *Id.* Lowery's cardiac symptoms, including psychological preoccupation with those symptoms, would also "occasionally" be "severe enough to interfere with attention and concentration needed to perform even simple work tasks." R. 939. Finally, Dr. Iskandar noted that Lowery would miss more than four days of work each month. R. 941.

---

[9] One page of the five-page questionnaire appears to be missing from the current record. *Compare* R. 78, 108, *with* R. 938–41. According to the state-agency physician who reviewed the record in September 2011, Dr. Iskandar also opined that Lowery could walk one-half block without rest or severe pain; sit, stand, and walk for less than two hours; and needed unscheduled breaks. R. 108. ALJ Kilbane did not mention these specific limitations, but he noted that other physical limitations identified by Dr. Iskandar were inconsistent with his treatment notes, including normal findings on physical examination. R. 24–25. Lowery does not address these specific findings in his brief.

On September 19, 2011, a state-agency physician provided a physical RFC assessment based on the evidence submitted to the agency through September 16, 2011. *See* R. 104–09, 113–16. The physician concluded that Lowery could lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally; sit with normal breaks for more than six hours in an eight-hour workday; stand and walk with normal breaks for about six hours in an eight-hour day; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and frequently stoop, kneel, crouch, or crawl. *See* R. 113–14. Based on this RFC, the physician concluded that Lowery could perform a full or wide range of light work. *See* R. 115–16.

On December 28, 2011, state-agency reviewer Dr. Martin Cader, M.D., provided a current physical RFC assessment based on evidence submitted to the agency through November 25, 2011. *See* R. 136, 148–50, 854. Dr. Cader's RFC assessment adopted the first state-agency physician's RFC assessment in full. *Compare* R. 147–50, *with* R. 113–16. Dr. Cader also opined that Dr. Iskandar's April 2009 cardiac functional assessment was "not entirely consistent with the medical evidence" in Lowery's current record. R. 141, 147.

The agency arranged for Dr. E. Wayne Sloop, Ph.D., to evaluate Lowery's mental status because an agency reviewer had determined that the evidence available in December 2011 was insufficient to support a reconsidered decision on his claim. *See* R. 143. Dr. Sloop conducted a "lengthy examination" on March 1, 2012, during which Lowery was alert, "cooperative, jovial, and pleasant." R. 844, 847. Lowery told Dr. Sloop that he "experienced long-term depressed mood" and was diagnosed with bi-polar disorder in 1999, but that he had "not received any treatment for this condition." R. 845. Lowery also reported that he had not received any mental-health care in thirteen years and did not take any psychotropic medications as of March 2012.

9

Lowery told Dr. Sloop that he last worked in 2001, when he was "unable to find a job" after having two surgeries. R. 845. "He looked for work until about 2002 or 2003 and then stopped looking. He ha[d] not attempted to return to work since 2003." *Id.* When asked to explain why he could not work, Lowery told Dr. Sloop that "he feels exhausted all the time, he has diarrhea frequently, he experiences frequent nausea and vomiting, and he never knows when he will have an angina episode." *Id.*

Dr. Sloop observed that Lowery's "mood [was] marked by mild anxiety and mild depression," but his mental examination was otherwise unremarkable. R. 847. Lowery did "not show evidence of problems with concentration or attention," but his immediate and recent memory were "deficient" on exam. *Id.* His overall intellectual function fell within the average range, with the "only problem area" being in working memory. R. 848. Lowery's below-average performance in this area did not indicate "significant deficits in memory functioning," however. R. 849. Ultimately, test results did not indicate any cognitive impairment. R. 847. Dr. Sloop considered the test results to be "valid given [Lowery's] good effort, good persistence, and good pace of responding" during the examination. R. 846.

Dr. Sloop opined that Lowery could manage "detailed and complex tasks as well as simple and repetitive tasks" and "seem[ed] able to perform work activities consistently and . . . without close supervision." R. 849. Lowery's "ability to deal with the usual stresses in competitive work [was] slightly diminished by depression and anxiety of mild severity," and he was "likely to feel some degree of stress because he tends to worry about" diarrhea and angina episodes. *Id.* Dr. Sloop also opined that Lowery's workplace attendance and ability to complete a normal workday or workweek "might be compromised by his physical ailments." *Id.*

10

On April 5, 2012, state-agency reviewer Dr. Richard Luck, Ph.D., evaluated Lowery's alleged mental impairment based on evidence submitted to the agency through March 28, 2012. *See* R. 135, 146. Dr. Luck opined that Lowery's affective disorder was "non-severe" because it caused no episodes of decompensation, no restrictions in Lowery's activities of daily living, and only "mild" difficulties in social functioning, concentration, persistence, and pace. R. 146. Dr. Luck also gave Dr. Sloop's medical opinions "great weight" because they were consistent with the other psychiatric evidence in Lowery's record. R. 147.

2.    *The ALJ's Findings*

ALJ Kilbane weighed each of these opinions in forming Lowery's RFC. *See* R. 24–25. He gave "minimal weight" to Dr. Iskandar's April 7, 2009, opinion. R. 24. The ALJ explained that Dr. Iskandar's opinion about Lowery's physical limitations was internally inconsistent with his NYHA classification of Lowery's heart failure, which indicated at most "mild symptoms and slight limitation during normal physical activity." *Id.* He also explained that these opinions were outdated and inconsistent with Dr. Iskandar's treatment notes showing that Lowery "had normal findings on physical examinations in September and October 2011." R. 25.

The ALJ's RFC assessment for a limited range of light work conflicts with Dr. Iskandar's weight-lifting restrictions, which necessarily limit Lowery to sedentary work. *See* 20 C.F.R. §§ 416.967(a) (sedentary work involves lifting no more than ten pounds and "occasionally" lifting or carrying objects like docket files or small tools), 416.967(b) (light work involves "frequently" lifting or carrying objects weight up to ten pounds but never lifting more than twenty pounds). The final RFC also does not incorporate Dr. Iskandar's opinion that Lowery's cardiac condition would interfere with his ability to complete a normal workday or workweek. *See* R. 20, 938–41.

11

The ALJ gave "significant weight" to the opinions of the state-agency reviewers who opined that Lowery did not have "any severe mental impairments" and could perform "light work" as long as he only occasionally climbed ramps, stairs, ladders, or scaffolding. R. 25. The ALJ explained that these opinions were "supported by the credible evidence of record, particularly [Lowery's] conservative treatment and the minimal findings on examinations and diagnostic tests." R. 25. The ALJ's final RFC determination does not conflict with the state-agency reviewers' assessments.

The ALJ gave "significant weight" to Dr. Sloop's opinion that Lowery's "ability to deal with the usual stresses in competitive work [was] slightly diminished by anxiety and depression of mild severity." R. 25. He also credited Dr. Sloop's opinion that Lowery could manage "simple and repetitive tasks" and "detailed and complex tasks" and perform work activities consistently and without close supervision. *Id.* However, the ALJ rejected Dr. Sloop's opinion that Lowery's physical ailments might compromise his workplace attendance and performance. *Id.* He explained that this particular portion of Dr. Sloop's "opinion appears to be based more on the claimant's subjective complaints and is outside of [the psychologist's] area of expertise." *Id.* The ALJ's final RFC assessment does not conflict with Dr. Sloop's opinions about Lowery's mental impairment or abilities. *See* R. 20, 847–49.

3.    *Analysis*

Lowery challenges ALJ Kilbane's analysis of opinions from Drs. Iskandar, Sloop, and Cader. His overarching objection is that the ALJ rejected Dr. Iskandar's April 2009 opinion that Lowery could rarely lift ten pounds, as well as Drs. Iskandar and Sloop's opinions that Lowery could not maintain acceptable workplace attendance and performance. *See* Pl. Br. 17–19. He also objects to the ALJ's reliance on contrary opinions from Dr. Cader. *See id.* at 17.

12

Lowery argues that the ALJ did not give good reasons for rejecting Dr. Iskandar's opinions of Lowery's physical limitations. *See id.* at 18–19, 19 n.4. The ALJ explained that he gave these opinions "minimal weight" because they were internally inconsistent, outdated, and inconsistent with Dr. Iskandar's treatment notes documenting normal findings on exam during the relevant period. *See* R. 24. These reasons are adequate to discount a treating-source opinion if they are supported by the record. *See Lowery v. Comm'r of Soc. Sec.*, 4:10cv47, 2011 WL 2648470, at *2, *4 (W.D. Va. June 29, 2011) (Crigler, M.J.) (substantial evidence supported ALJ Owen's decision to discount the same opinions because they were internally inconsistent and inconsistent with other evidence in the record), *adopted by* 2011 WL 2836251 (July 14, 2011) (Kiser, J.); *Mastro*, 271 F.3d at 178 (substantial evidence supported ALJ's decision to reject treating physician's opinion in light of a more recent opinion from another examining physician); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (substantial evidence supported ALJ's decision to reject treating physician's opinion where the opinion was not supported by the physician's own treatment notes and was inconsistent with the claimant's daily activities); *Chestnut v. Colvin*, No. 4:13cv8, 2014 WL 296714, at *3–4 (W.D. Va. June 30, 2014) (Kiser, J.) (same).

Lowery argues that the ALJ's "finding[] that Dr. Iskandar's opinion is not valid because of Dr. Iskandar's own inconsistencies is irrational [because] Dr. Iskandar has explained that his RFC was based on not only . . . Lowery's cardiac disease but also his other conditions including COPD." Pl. Br. 18. Presumably, Lowery is referring to a letter that Dr. Iskandar wrote to Lowery's attorney on December 12, 2012, which addressed Lowery's condition as of his most recent visit with Dr. Iskandar on November 2, 2012. *See* R. 942–43. Lowery submitted this letter to the Appeals Council, which concluded that it did not provide a basis for changing the ALJ's decision. *See* R. 1, 5.

13

In the letter, Dr. Iskandar explained that Lowery's "activity from the cardiovascular standpoint is mostly limited at this time by chest pain" secondary to inoperable coronary artery disease. R. 943. This letter does not indicate that Dr. Iskandar's April 2009, cardiac functional assessment was "based on" any condition other than Lowery's NYHA Class I–II coronary artery disease. *See generally* R. 938, 942–43. Nor did Dr. Iskandar state that Lowery's physical activity was restricted by "other conditions" during the relevant period. R. 942–43. At most, he acknowledged that Lowery experienced shortness of breath that was "partially related to his congestive heart failure [but] mostly related to him continuing to smoke as well as possible lung damage secondary to this habit." R. 943. Dr. Iskandar did not explain how, if at all, this smoking-induced dyspnea affected Lowery's physical capacity in December 2012. *See* R. 942–43. He also cautioned that Lowery's "possible" COPD—if present—would be monitored by Lowery's primary-care physician. R. 942–43.

Lowery does not explain how Dr. Iskandar's letter undermines ALJ Kilbane's finding that the "marked" physical restrictions Dr. Iskandar identified in his 2009 assessment were internally inconsistent with his opinion that Lowery had NYHA Class I–II heart failure. R. 24. Indeed, Dr. Iskandar concedes that inconsistency in his letter to Lowery's attorney. Referring to the report and recommendation in *Lowery v. Commissioner of Social Security*, Dr. Iskandar wrote:

> I did review the [report and recommendation] . . . which states on page 6 that there was [*sic*] inconsistencies in my [April 7, 2009] report. The [report and recommendation] states that I expressed that . . . Mr. Lowery's heart failure fall[s] within the NYHC [*sic*] I–II and that this finding signifies that [Lowery] had no limitation in ordinary physical activity or only mild symptoms and only slight limitation during ordinary activity. *That is true as the patients [*sic*] congestive heart failure is not his limiting factor from the cardiovascular standpoint.*

R. 942 (emphasis added) (citing R. 96). On this record, I see no error with ALJ Kilbane's finding that Dr. Iskandar's opinions were internally inconsistent. *Lowery*, 2011 WL 2648470, at *3–4.

Nor does Dr. Iskandar's letter undermine ALJ Kilbane's finding that Dr. Iskandar's opinion was inconsistent with his treatment notes showing "normal findings on physical examinations in September and October 2011." R. 25. Dr. Iskandar indeed documented "clear" lungs and "regular" heart rate and rhythm on September 6, 2011 and October 3, 2011. R. 677, 678. This was true even on the one occasion that Lowery complained of non-exertional chest pain, stable dyspnea on exertion, and easy fatigue. R. 678 (Sept. 2011). On this visit, Dr. Iskandar diagnosed Lowery with hypertension, hyperlipidemia, and "stable" coronary artery disease. *Id.* Lowery did not report fatigue or chest pain on his visit in October 2011. R. 677.

Medical records produced in 2012 and 2013 further support the ALJ's finding that Dr. Iskandar's opinion was inconsistent with treatment notes from the relevant period. For example, Dr. Johanna Brown, M.D., Lowery's infectious-disease specialist, documented normal pulmonary and cardiovascular findings on exam in October 2012. *See* R. 911. Lowery denied chest pain[10] and shortness of breath on this visit and reported that he was "currently able to do activities of daily living with limitations." R. 910, 911. He did not identify these limitations, and contemporaneous medical records do not document specific restrictions on Lowery's activity.

Dr. Brown also documented normal pulmonary and cardiovascular findings on exams in January and July 2013. R. 975, 980. Lowery again denied chest pain and shortness of breath on

___

[10] In his letter, Dr. Iskandar noted that Lowery "complain[ed] of chest pain" on November 2, 2012, which was "consistent with angina" and "probably" caused by an inoperable occluded right coronary artery. R. 942, 943. The letter also refers to "an echocardiogram performed on September 21, 2012, which showed an ejection fraction of 55–60%." R. 942. These medical records are not included in the record on appeal. *See* R. 5.

However, the echocardiogram results are consistent with a "normal" echocardiogram performed on July 11, 2011, R. 651 ("Overall left ventricular systolic function is normal with an EF [ejection fraction] between 55–60%."), that the ALJ discussed in his written opinion, R. 22, 24. Lowery also repeatedly denied experiencing chest pain and shortness of breath after he had a cardiac stent placed in December 2011. *See* R. 775, 828 (Jan. 2012); R. 910 (Oct. 2012) R. 918–20 (July 2012); R. 925–26 (Apr. 2012); R. 944–45 (Jan. 2013); R. 976 (July 2013).

Case 4:13-cv-00060-JLK-JCH   Document 17   Filed 12/01/14   Page 15 of 25   Pageid#: 1094

these visits, although he still reported unspecified limitations on his activities of daily living in January. *See id.* In July, however, Lowery told Dr. Brown that he was "currently able to do activities of daily living without limitations." R. 974.

Lowery does not point to specific evidence that arguably entitled Dr. Iskandar's weight-lifting restriction to "much greater weight" than other medical opinions in his record. *See* Pl. Br. 18. He simply disagrees with ALJ Kilbane's choice between conflicting medical evidence. *See id.* at 17, 18. This Court cannot second-guess that choice where, as here, the ALJ gave "specific and legitimate reasons," supported by substantial evidence in the current record, for discrediting Dr. Iskandar's opinions. *Bishop v. Comm'r of Soc. Sec.*, --- F. App'x ---, 2014 WL 4347190, at *1–2 (4th Cir. 2014) (per curiam). Given the persuasive contrary evidence discussed above, I find no error with the ALJ's decision to reject Dr. Iskander's limitation to less than light work. *See Mastro*, 270 F.3d at 178; *Lowery*, 2011 WL 2648470, at *3–4.

I also find no error with the ALJ's decision to give "significant weight" to Dr. Cader's opinion that Lowery could perform light work with additional postural limitations. *See* R. 25. Lowery argues that the ALJ "simply adopted" Dr. Cader's physical assessment and that this was "irrational" because, according to Lowery, the evidence available to Dr. Cader in December 2011 included someone else's medical records. Pl. Br. 17. He objects to Dr. Cader's opinion because it "relied on," R. 348, the other person's medical records. *See* Pl. Br. 17.

The Disability Determination Explanation report stating the reasons Lowery's claim was denied upon reconsideration in April 2012 summarizes a medical record from the Cardiovascular Group dated December 23, 2011. *See* R. 144. This record, which belonged to someone else,[11]

---

[11] Lowery's attorney brought this to the agency's attention on December 10, 2012. *See* R. 348; Pl. Br. 17. ALJ Kilbane does not mention this person's medical record in his thorough discussion of the medical evidence in the record as of December 21, 2012. *See* R. 22–23.

16

was apparently included in Lowery's updated Cardiovascular Group records submitted to the agency on January 27, 2012—one month after Dr. Cader provided his RFC assessment. *See* R. 136, 854, 816–26, 827–42, 855–56. There is no evidence that Dr. Cader had the other person's treatment notes in December 2011. *See generally* R. 136–42, 147–48.

Nor is there any evidence that the ALJ "simply adopted," Pl. Br. 17, Dr. Cader's opinion. ALJ Kilbane explained that he gave Dr. Cader's opinion "significant weight" because it was "supported by . . . [Lowery's] conservative treatment and the minimal findings on examination and diagnostic testing" during the relevant period. R. 25. *Compare Radford*, 734 F.3d at 295 (ordering sentence-four remand where the ALJ did not explain the weight he gave to a state-agency reviewer's opinion or the reasons for that weight). These are legitimate factors to consider when weighing opinions from non-examining physicians. 20 C.F.R. § 416.927(e)(2).

Further, the ALJ can rely on a non-examining physician's opinion when it is consistent with the record. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984). Dr. Cader's RFC for light work is consistent with other evidence in the current record, including Lowery's reports that he can lift and carry up to twenty pounds. *See* R. 283 (Aug. 2011); R. 45 (Nov. 2012). A person who can lift twenty pounds (and frequently lift and carry ten pounds) can perform light work if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays*, 907 F.2d at 1455 n.1. Dr. Cader opined that Lowery could meet these physical requirements based on the evidence available in December 2011. *See* R. 147–48. Save for Dr. Iskandar's outdated opinions—which ALJ Kilbane reasonably rejected—Lowery does not point to any evidence in the current record that conflicts with Dr. Cader's opinion.

Finally, Lowery objects to ALJ Kilbane's "dismissal" of Drs. Iskandar and Sloop's opinions that Lowery's physical ailments might compromise his workplace attendance and

performance. *See* Pl. Br. 19 (citing R. 25, 849, 939, 941). He argues that this was "irrational" and "contrary to" the factors listed 20 C.F.R. § 416.927(c) because the examining doctors' opinions "corroborate" each other. Pl. Br. 18–19. These conclusory portions of Drs. Iskandar and Sloop's opinions are indeed consistent with each other and with Lowery's subjective report of limitations. But, as ALJ Kilbane pointed out, neither opinion is consistent with other credible evidence in the record. *See* R. 21, 23, 24–25.

ALJ Kilbane rejected the "physical ailment" portion of Dr. Sloop's opinion "because it appear[ed] to be based more on the claimant's subjective complaints" and was beyond the psychologist's "area of expertise." R. 25. The ALJ may give "significantly less weight" to even a treating physician's "conclusory opinion [that is] based on the applicant's subjective reports." *Craig*, 76 F.3d at 590. He may reject such an opinion if his stated rationale is supported by the record. 20 C.F.R. §§ 416.927(c)(2) (source's familiarity with the applicant), 416.927(c)(3) (opinion's supportability), 416.927(c)(5) (source's medical specialty).

This requirement was easily met here. Lowery told Dr. Sloop in March 2012 that he "cannot work because he feels exhausted all the time, he has diarrhea frequently, he experiences frequent nausea and vomiting, and he never knows when he will have an angina episode." R. 845. These complaints mirror Dr. Sloop's opinion that Lowery's physical ailments might compromise his ability to complete a normal workday or workweek without interruption. R. 849. They conflict with treating physicians' contemporaneous notes that Lowery suffered "[n]o recurrent anginal symptoms," R. 827 (Jan. 2012); denied chest pain, dyspnea, fatigue, nausea, vomiting, and diarrhea, R. 918, 926 (Apr. & July 2012); and was "currently able to do activities of daily living without limitations," R. 918 (July 2012). During his only examination of Lowery, Dr. Sloop, a psychologist, conducted mental status assessments and testing, but no physical

18

assessment. Notably, Dr. Sloop did not state that this portion of his opinion was "based on" anything, much less his objective findings on exam. *See* R. 847–49. Accordingly, I find that substantial evidence supports ALJ Kilbane's evaluation of the medical opinions in Lowery's case.

B. *Combined Limitations*

Lowery next argues that ALJ Kilbane "failed to consider all of [his] impairments combined" when formulating the RFC, at least in part because he did not include all of Lowery's "mental limitations in a proper [h]ypothetical" to the VE.[12] Pl. Br. 20. ALJ Kilbane acknowledged Lowery's allegation "that the combination of his impairments make him unable to work." R. 21. The ALJ thoroughly discussed the medical evidence and addressed all of Lowery's impairments, including those that he found non-severe. *See* R. 17–26. Absent evidence to the contrary, this discussion is sufficient to show that the Commissioner "considered" the combined limiting effects of Lowery's impairments. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). Notably, Lowery does not "point to any specific evidence not considered by the Commissioner that might have changed the outcome" in his case. *Id.* (emphasis omitted).

Finally, Lowery argues that ALJ Kilbane's RFC determination and the resulting hypothetical presented to the VE do not reflect the combined effects of his cardiac, pulmonary,

---

[12] In the argument heading, Lowery faults the ALJ for "not including all of . . . Lowery's mental limitations in a proper [h]ypothetical," but in the body of the argument, he does not mention any mental impairments or attribute any limitations to those impairments. Pl. Br. 19. ALJ Kilbane found that Lowery's mental impairment was a "slight abnormality" that had such a "minimal effect on [Lowery] that it would not be excepted to interfere," *Evans v. Heckler*, 734 F.2d 1012, 1013 (4th Cir. 1984) (emphasis omitted), with his ability to follow simple instructions, respond appropriately to other people, and cope with changes in a routine work setting, 20 C.F.R. § 416.921(b). This finding, which Lowery does not challenge on appeal, is supported by substantial evidence in the record. *See, e.g.*, R. 145–46 (Dr. Luck's opinion); R. 846–49 (Dr. Sloop's opinion); R. 684, 736, 775, 783, 910–11, 918–19, 925–26, 945, 975 (Lowery expressly denying psychological symptoms between July 2011 and July 2013).

immune, psychological, and skin disorders—particularly his "extraordinarily credible" description of maladies and medications that "in combination would render even [S]uperman tired and fatigued." Pl. Br. 20. Lowery does not identify what specific limitations he believes the ALJ should have incorporated in the RFC. Rather, he argues that he experienced fatigue, tiredness, lethargy, and diarrhea resulting from his impairments and medications.

The RFC must reflect the combined limiting effects of impairments "supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints." *Carter v. Astrue*, No. 3:10cv510, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011), *adopted by* 2011 WL 2693392 (July 11, 2011); *accord* 20 C.F.R. § 416.945(e). Although this Court reviews the ALJ's RFC determination for substantial evidence, the claimant bears the burden of showing that an omitted limitation should have been included in his RFC, *Lowery*, 2011 WL 2648470, at *4, and that the omission was not harmless, *Bolden v. Colvin*, No. 4:13cv32, slip op. at 21 (W.D. Va. July 23, 2014) (Hoppe, M.J.), *adopted by* 2014 WL 4052856, at *1 (Aug. 14, 2014) (Kiser, J.).

ALJ Kilbane found that Lowery could perform a limited range of light work in a normal work setting. *See* R. 20, 26–27. This RFC does not incorporate limitations related to workplace attendance and performance because ALJ Kilbane discredited Lowery's testimony about the severity of the symptoms from his impairments and the side effects from his medications.

In November 2012, Lowery testified that his current antiretroviral medication, Complera, caused "outrageous" side effects including "diarrhea, depression, dizziness, sleep, [and] hallucinations." R. 40, 42. ALJ Kilbane acknowledged Lowery's allegations, but found them not fully credible because Lowery never reported such side effects to his healthcare providers. R. 24.

Case 4:13-cv-00060-JLK-JCH   Document 17   Filed 12/01/14   Page 20 of 25   Pageid#: 1099

This is a legitimate reason to discredit a claimant's testimony if it is supported by the record. *See Lowery*, 2011 WL 2648470, at *4.

This requirement was easily met here. Lowery reported experiencing "vivid dreams and lethargy" (but not diarrhea) several months after starting his first antiretroviral medication, Atripla. *See* R. 684 (Sept. 2011); R. 782, 784 (Jan. 2012). In January 2012, Dr. Robert Brennan, M.D., switched Lowery to Complera "in hopes of decreasing CNS [central nervous system] side effects." R. 784. At his next visit to Infectious Disease Associates in April 2012, Lowery reported that he was "tolerating the Complera well" and his "vivid dreams and CNS symptoms resolved when Atripla stopped." R. 925. He also reported "no adverse reactions" to Complera in July and October 2012. R. 909, 918. On all three visits, Lowery expressly denied experiencing nausea, vomiting, diarrhea, depression, dizziness, fatigue, and hallucinations. *See* R. 910–11, 918–19, 926.

Indeed, Lowery first reported having an adverse reaction (nausea or vomiting, diarrhea, stabbing pains) to Complera on January 8, 2013—two weeks after ALJ Kilbane issued the decision now on appeal. *See* R. 944–49. These side effects did not cause Lowery to try a different antiretroviral medication, however. *See* R. 944 ("Patient does have some side effects from Complera however he does not wish to change medication, side effects are tolerable, and less severe than side effects experienced with Atripla."). Moreover, Lowery reported that they were resolved when he returned for a follow-up visit on July 2, 2013. *See* R. 974–75.

Contrary to Lowery's argument, his doctors at Infectious Disease Associates never "opined" that Lowery had "limitations on his daily activities of living as a result of his HIV and antiretr[oviral] treatment." Pl. Br. 22. They simply noted Lowery's own reports that he was "able to do activities of daily living with limitations" in October 2012 and January 2013. R. 910, 944;

*see also* R. 918, 974 (noting Lowery's reports in July 2012 and July 2013 that he was "able to do activities of daily living without limitations"). The same doctors also repeatedly classified Lowery's condition as "[a]symptomatic HIV infection" after he started antiretroviral medication in September 2011. *See* R. 782 (Jan. 2012); R. 925 (Apr. 2012); R. 918 (July 2012); R. 910 (Oct. 2012); R. 944 (Jan. 2013); R. 974 (July 2013).

On this record, it was not unreasonable for the ALJ to discredit Lowery's testimony that he suffered debilitating side effects on his antiretroviral medication. *See Lowery*, 2011 WL 2648470, at *4. Thus, Lowery has again "failed to show that his diarrhea and medication side effects create limitations [that] should have been included" in his RFC. *Id.*; *see also Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005) (noting that common medication side effects "should not be viewed as disabling unless the record reflects serious functional limitations").

The final RFC also does not incorporate Lowery's "uncontroverted" need to "avoid sunlight," Pl. Br. 22, because the medical records available to ALJ Kilbane in December 2012 did not document any such medical advice. *See* R. 5, 17, 972. On March 26, 2013, Lowery's dermatologist recommended that he wear sunscreen and "sunprotective" clothing and avoid sunlight from 10:00 a.m. to 4:00 p.m. R. 972. Lowery submitted these records to the Appeals Council, which found that they did not provide a basis for changing ALJ Kilbane's decision. *See* R. 1–2. Lowery does not explain how this limitation—uncontroverted as it may be—would change the outcome in his case. *See* Pl. Br. 22. The Commissioner responds that ALJ Kilbane found Lowery could perform specific jobs (information and record clerk, counter and rental clerk, and hand packer) that are traditionally performed indoors. *See* Def. Br. 19. Accordingly, I find that the Commissioner's failure to incorporate this limitation into Lowery's final RFC, if error, was harmless. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 697 (W.D. Va. 2009) ("Errors

22

are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

In determining that Lowery could perform a limited range of light work, the ALJ gave significant weight to Dr. Cader's opinion because it was supported by the record, particularly Lowery's conservative treatment and the minimal findings on examination and in diagnostic testing. R. 27. Lowery takes issue with this RFC, asserting that his coronary artery disease and COPD contribute to his lethargy and physical limitations. Pl. Br. 22. The medical records related to these impairments do not show limitations to the extent Lowery claims.

A July 11, 2011, echocardiogram showed that Lowery's "[o]verall left ventricular systolic function [was] normal with an EF [ejection fraction] between 55–60%." R. 651. In August 2011, Lowery's primary-care provider documented "clear" lungs and "regular" heart rate and rhythm. R. 603. He instructed Lowery to continue his COPD medication. *See* R. 602–03. Dr. Iskandar also documented "clear" lungs and "regular" heart rate and rhythm in September and October 2011. R. 677, 678. He noted similar findings even on the one occasion that Lowery complained of non-exertional chest pain, stable dyspnea on exertion, and easy fatigue. R. 678 (Sept. 2011). Dr. Iskandar diagnosed Lowery with "stable" coronary artery disease on this visit. *See id.*

Lowery's other treating cardiologist, Dr. Peter O'Brien, M.D., also noted that Lowery's coronary artery disease was "stable" without "recurring anginal symptoms" following the placement of a stent in December 2011. *See* R. 24, 827. The stent was placed to reduce a 70% lesion in Lowery's left internal carotid artery. *See* R. 793–94. Lowery consistently denied experiencing cardio-pulmonary symptoms (*e.g.*, chest pain, dyspnea, easy fatigue) after this procedure. *See* R. 775, 828 (Jan. 2012); R. 910 (Oct. 2012) R. 918–20 (July 2012); R. 925–26

23

(Apr. 2012); R. 944–45 (Jan. 2013); R. 976 (July 2013). He also twice reported that he was "currently able to do activities of daily living without limitations." R. 918 (July 2012); R. 974 (July 2013).

Finally, treatment records dated between January 2012 and July 2013 document "normal" cardiovascular and pulmonary findings on physical exams and diagnostic studies. *See, e.g.*, R. 775–76, 828–30 (Jan. 2012); R. 911 (Oct. 2012); R. 920 (July 2012); R. 927 (Apr. 2012); R. 946 (Jan. 2013); R. 976 (July 2013). The only arguable exception is a January 10, 2012, carotid duplex study showing "mild" diffuse disease in Lowery's right internal carotid artery. R. 831. Dr. O'Brien, the cardiologist who placed the stent in December 2011, did not express concern over these results at a follow-up appointment two weeks later. *See* R. 827–30. Rather, he instructed Lowery to continue his medications and encouraged him to stop smoking.[13] *See id.*

This medical evidence provides ample support for the ALJ's RFC assessment. The ALJ's reliance on the VE's testimony in response to a hypothetical question reflecting this RFC, *see* R. 27, 51, also was proper. *See Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) ("In order for a vocational expert's opinion to be relevant or helpful, . . . it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." (brackets omitted)); *Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002) (holding that a VE's reliable testimony provides substantial evidence to support the Commissioner's final decision that a person is not disabled).

---

[13] As ALJ Kilbane pointed out, Lowery repeatedly refused to stop smoking despite warnings from multiple providers that it exacerbated his cardio-pulmonary disorders. *See, e.g.*, R. 680–81 (Oct. 2011); R. 718 (Nov. 2011); R. 762 (Dec. 2011); R. 776, 827–28, 831 (Jan. 2012); R. 919 (July 2012); R. 909–12 (Oct. 2012); R. 942–43 (Dec. 2012); R. 944 (Jan. 2013); R. 974 (July 2013).

IV. Conclusion

This Court must affirm the Commissioner's final decision that a person is not disabled if the ALJ properly applied the law and substantial evidence in the current record supports his factual findings. I find that both requirements were met here. Therefore, I recommend that this Court **DENY** Lowery's motion for summary judgment, ECF No. 12, **GRANT** the Commissioner's motion for summary judgment, ECF No. 15, and **DISMISS** this case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: December 1, 2014

Joel C. Hoppe
United States Magistrate Judge

25